IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TIMOTHY CLEMENS,
　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　Civil Action No. 1:09CV94
　　　　　　　　　　　　　　　　　　　　(Keeley)

MICHAEL ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
　　　　　Defendant.

## REPORT AND RECOMMENDATION/OPINION

　　　　Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

　　　　Timothy Clemens ("Plaintiff") filed applications for DIB and SSI on March 31, 2005,

alleging disability beginning October 17, 2003, due to a low back injury (R. 76).[1]  Both applications

were denied initially and on reconsideration (R. 16, 6).  Plaintiff requested a hearing, which

Administrative Law Judge ("ALJ") Karl Alexander held on May 17, 2007 (R. 311).  By decision

---

[1] The Court notes that Defendant filed a previous application on June 23, 2004, also
alleging disability beginning October 17, 2003, which was denied initially, on reconsideration,
and by an unfavorable decision by an Administrative Law Judge on March 1, 2005 (R. 19).
Plaintiff sought no review of the 2005 decision, and it therefore became the final decision of the
Commissioner adjudicating the period from October 17, 2003, to March 1, 2005.  The current
claim therefore covers only the period from March 1, 2005, through the date of the ALJ's
decision in this case, August 3, 2007.

dated August 3, 2007, the ALJ denied benefits (R. 16). The Appeals Council denied Plaintiff's

request for review May 15, 2009, and he appealed the ALJ's decision to the United States District

Court of the Northern District of West Virginia.

## II. Statement of Facts

Timothy Clemens ("Plaintiff") was born on December 8, 1977, and was 25 years old on his

alleged onset date and 29 years old at the time of the ALJ's second decision (R. 16). He has a high

school equivalent education (R. 27). He has past relevant work experience as a finish sander,

detailing machine operator and general laborer at a sawmill, as well as blacktop and stone paving

laborer (R. 142). According to Plaintiff's application for benefits, he began working as a lumber

stacker at a saw mill in June 2003 (R. 85). He hurt his back on the job stacking lumber on October

17, 2003 (R. 151) and has not worked since that time.

On November 10, 2003, an MRI of the lumbar spine was performed, which revealed

unusually straight alignment of the lumbar spine but also indicated it may have been "an anatomic

variation" (R. 285). Multiple Schmorl's nodes were present and there was asymmetric disc

protrusion of the left lateral recess of L5-S1 which could affect the exiting nerve root, "though the

appearance is considered equivocal and should be correlated with the symptomatology." There was

no central stenosis or effect on the right side.

On December 8, 2003, neurologist Dr. James D. Weinstein wrote to chiropractor William

Good, D.C., after examining the Plaintiff and reviewing his lumbar MRI. The neurologist opined

the MRI was "minimally abnormal" (R. 148).

On December 16, 2003, multiple consecutive axial images of the lumbar spine were taken

at Davis Memorial. The images showed mild diffuse central disc bulge at L4-5 without significant

central or lateral spinal canal stenosis and left para-central disc bulge at L5-S1. There was no evidence of either central or lateral spinal canal stenosis (R. 234). On that same date a complete myelography-lumbar procedure was also performed and revealed mild central disc bulge at L4-5 resulting in extra dural impress at the L4-5and possible left para-central diffuse disc bulge at L5-S1 (R. 235).

On December 29, 2003, Dr. James D. Weinstein wrote to chiropractor Good, reporting that Plaintiff was feeling a lot better and was no longer a candidate for potential surgery. He noted the Plaintiff's myelogram CT scan suggested pathology at S-1 on the left but that the films did not come down with his myelogram so his comments were limited (R. 147). He noted: "But as long as he is feeling well I won't consider surgery in any case." Post Script by Dr. Weinstein, "I recommend the patient seriously look around for some other kind of work. He is only 26 and it is very unlikely he won't have trouble with the heavy physical work that he does with or without surgery."

On February 4, 2004, Dr. James D. Weinstein wrote to chiropractor Good, after review of an MRI and myelogram CT scan and reported there was a definite, but moderate disc bulge at L5-S1 on the left, which involved the left S1 nerve root. Dr. Weinstein still did not recommend surgery. He did not think it would hurt to get an S1 nerve block on the left (R. 146).

A successful left S1 nerve block was performed on February 19, 2004 (R. 149).

On June 16, 2004, Dr. Mohamed Fahim wrote to chiropractor Good, after his evaluation showed the Plaintiff had left piriformis muscle syndrome. Plaintiff told the doctor his pain was aching in character and continuous, and he rated the pain as only a level 2 out of 10 on average, but 10 out of 10 at its worse. He had no nausea or vomiting. He had no sleep difficulty. The pain did not affect his normal sleeping hours. He was on no current medications. He had no depression or

anxiety. His MRI showed disc protrusion at L5-S1, and disc bulge at L4-5 level. His gait was steady and he could walk on his toes and heels. Straight leg raising was positive at 60 degrees bilaterally. Plaintiff was started on Baclofen, Vioxx and scheduled for an injection of the piriformis muscle (R. 150).

Emergency Department records from Davis Memorial Hospital dated August 30, 2004, indicate Plaintiff was seen for chronic sharp back pain (R. 231).

Emergency Department records from Davis Memorial Hospital dated September 17, 2004, indicate Plaintiff was seen for continued acute back pain and advised to follow-up with Dr. Weinstein (R. 226).

Emergency Department records from Davis Memorial Hospital dated October 6, 2004, indicate Plaintiff was seen for chronic dull back pain which started (1) one year earlier (R. 223).

On November 16, 2004, the treating physician of record changed from William Good, D.C., to Dr. James W. Gainer per the Workers' Compensation Commission (R. 170).

An MRI on December 10, 2004, revealed left paracentral and foraminal disc protrusion with mild left foraminal stenosis (R. 221).

Plaintiff was admitted for observation on December 19, 2004, and for regular admission two days later, at Davis Memorial Hospital after presenting with persistent nausea and vomiting. Dr. James Gainer's discharge diagnosis was: (1) gastritis and esophagitis; (2) persistent nausea and vomiting; and (3) chronic back pain post-injury (R. 157). It was noted that Plaintiff had been around a cousin recently, who was also admitted on the same floor for similar symptoms (R. 160). Chest radiographs indicated: "Questionable gallstones or possible renal calculi, although I believe the density actually may be within the bowel." (R. 165). An upper GI endoscopy with biopsy of the

gastric mucosa was performed, which showed a very erosive area of gastritis at the junction between the cardia and the fundus on the lesser curve (R. 158). A biopsy of the area showed mild chronic gastritis, focal scarring, and hyperemia.

Plaintiff again presented to the hospital at 10:47 a.m. on December 24, 2004, with complaints of nausea, vomiting, and diarrhea all morning (R. 208). There is a "late entry" at 11:30, stating that "Pt. [was] heard coughing–then pt. was observed removing finger from throat. No emesis at present." (R. 212). A single view of the chest as well as flat and upright views of the abdomen were taken and found to be unremarkable (R. 219). A urine drug screen was positive and confirmed by repeat testing for cannabis, but negative for any other drugs, including opiates (R. 218).

In correspondence dated February 18, 2005, the Workers' Compensation Commission approved Dr. James Gainer's request for Hydrocodone w/Acetaminophen for Plaintiff (R. 167).

The prior ALJ decision is dated March 1, 2005, and the period of this adjudication therefore begins on that date.

In correspondence dated March 16, 2005, the Workers' Compensation Commission approved Dr. James Gainer's request for Vicodin ES for Plaintiff (R. 166).

Plaintiff was admitted to Davis Memorial Hospital with complaints of nausea and vomiting on March 24, 2005 (R.176). It was noted that he had a previous episode three months earlier. Plaintiff's discharge diagnosis dated March 25, 2005, was gastroenteritis with dehydration (R. 175). Plaintiff underwent an abdominal complete acute W/PA chest which identified no acute process (R. 180). He also underwent a CT Pelvis with contrast (R. 181) and a CT Abdomen without and with contrast on March 24, 2005. No abnormalities were detected (R. 182).

Physician records from Philip J. Chua, D.O., dated March 31, 2005, indicate the Plaintiff had

lumbar disc disease and lumbar radiculopathy (R. 249).

On Plaintiff's application for benefits dated April 18, 2005 (18 months after his alleged onset date), he described only one impairment-- lower back pain going down his left leg. He was taking one hydrocodone/APAP every 8 hours, which sometimes relieved the pain, but made him drowsy. He stated that he took care of his child (R. 93). He prepared his own meals, including soups, sandwiches, tv dinners, and frozen pizzas daily (R. 94). He also did light cleaning and laundry once a week without help or encouragement. He shopped for about an hour every two weeks for food and household items (R. 95). He was able to pay bills, count change, handle a savings account, and use a checkbook. He did not spend time with others, but had no problem getting along with others. He had no problem with authority figures. He had had no changes in social activities since his injury. He had no problem paying attention, no problem following instructions, and could finish what he started. He had no problem with memory, completing tasks, concentration or understanding.

On May 22, 2005, Arturo Sabio, M.D., examined Plaintiff at the request of the Commissioner (R. 188). Plaintiff complained of a constant aching in the lumbar spine sometimes radiating to the left leg as a severe pain. Plaintiff did not have any numbness or tingling of the extremities and he did not fall down. He reported a history of heartburn and took Reglan which relieved the heartburn. Medications were listed as Metoclopramide and Vicodin (R. 189).

Upon examination, Plaintiff had tenderness of the left lumbar area, radiating to the left hip. There was no kyphosis. Plaintiff was slightly bent at the hip at station about 20 degrees forward. Plaintiff stated that posture gave him the best relief of pain (R. 191). Plaintiff had 30 degrees of forward flexion in the lumbar spine and 10 degrees laterally to either side. He refused to go further because of pain in the lumbar spine (R. 191). Straight leg raising was 70 degrees on the left and 90

degrees on the right, restricted by back pain. Dr. Sabio's diagnostic impression was degenerative disk disease with disk protrusion and nerve root compression of the S1 on the left side (R. 191).

On June 1, 2005, a State agency reviewing medical consultant completed a Physical Residual Capacity Assessment ("RFC"), opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk about 6 hours in an 8-hour workday; and could sit about 6 hours in an 8-hour workday (R. 194). He could never climb ladders, ropes or scaffolds, and could occasionally perform all other postural movements. He should avoid concentrated exposure to extreme cold and vibration, and even moderate exposure to hazards. Based on the medical and non-medical information in the record, Plaintiff was found to be partially credible.

Plaintiff was admitted to Davis Memorial Hospital on June 9, 2005, having presented to the Emergency Department three times in three days with projectile bilious vomiting. Plaintiff's medications were Reglan and Hydrocodone (R. 203). Multiple films of the abdomen were taken which showed normal gas patterns (R. 202). An MRI of the abdomen identified no abnormalities (R. 201).

On July 12, 2005, Scott Harris, D.C., a chiropractor, wrote to the Workers' Compensation Commission after performing an independent medical examination of the Plaintiff on behalf of the agency. The Plaintiff complained of pain in his low back and into his left leg which he described as achy and sharp or stabbing at times (R. 277). He had increased pain when standing for extended periods of time, and with walking and bending. He was most comfortable sitting. He rated the pain at 5 on a level of 1-10. He denied any change in bowel or bladder habits and felt the pain remained the same since his injury. Plaintiff felt the pain seemed to cause him to have difficulty with many activities of daily living, and that he had been unable to return to work, but was able to do things

7

such as bathe and get dressed. He could no longer hunt or fish. Plaintiff also reported having spells of vomiting a couple of times this year.

Dr. Harris noted that Plaintiff had had an FCE in March 2004, which concluded he could do light duty work. He also went through the rehab process with Worker's Compensation in hopes of finding new employment. The doctor noted: "While he did make several attempts to find a new job he did not fully participate with the program and it was ended." Plaintiff reported his condition was about the same as at the time of his injury, that it had not changed for several months, and that he felt it was not going to change.

Upon physical examination, Plaintiff was well-developed, and well-nourished. He had pain in his low back and left leg with supine straight leg raising at 35 degrees on the left and 40 degrees on the right; however, he had pain on the left side at 80 degrees on the left with sitting straight leg raising. Plaintiff's maximum sacral flexion was 18 degrees and extension was 6 degrees. His tightest straight leg raising was 35 degrees. The form which Dr. Harris completed stated to add sacral flexion and extension ROM and compare to the tightest straight leg raising angle. "If tightest SLR ROM exceeds sum of sacral flexion and extension by more than 15 degrees, lumbar ROM test is invalid."

Dr. Harris opined that Plaintiff had reached maximum medical improvement and that he had a whole person impairment rating of 7% (R. 280). He opined that Plaintiff could return to light duty work, lifting no more than ten to fifteen pounds.

Physician records from Philip J. Chua, D.O., dated August 11, 2005, a month after Dr. Harris' examination, indicated the Plaintiff had lumbar disc disease and GI problems (R. 241). The severity of the back symptoms was noted to be "moderate."

One month later, on September 12, 2005, Dr. Chua indicated Plaintiff had herniated lumbar disc and severe chronic pain (R. 240). In a letter dated September 13, 2005, Dr. Chua wrote to the West Virginia Workers' Compensation Commission, regarding the Plaintiff's IME by Dr. Harris two months earlier (R. 275). He noted that Dr. Harris had found Plaintiff had reached maximum medical improvement and rated him at 7% whole person impairment, but then stated:

> I was reviewing all his records because I saw him on 09/12/2005 and Tim is doing quite a bit worse. He is having a lot of difficulty standing for any extended periods of time on his left leg. He has been trying to walk and get exercise in order to strengthen himself up and try to return to some sort of occupation. This has been basically impossible for him and he is starting to have some problems with the weakness on that left leg. This is certainly a marked decrease in functional capacity from my last examination of him prior to this on 08/11/2005 [one month earlier]. In addition, he is still taking quite a bit of pain medication for his back. I am kind of concerned that perhaps we have missed a possible surgical problem here. So far as I can tell from the records, he has evidence of a herniated disc on his MRI ordered by Dr. Good. This was done 11/10/2003. This pain seems to be progressing over the last few months. I think it might be reasonable to repeat an MRI at this time and just see if there has been an interval worsening of this herniated disc to the point where it may truly be a surgical problem. At that point, if it does show that there is interval worsening of the same herniated disc, he may now be a surgical candidate. At the very least, this pain has gotten quite a bit worse recently and I am concerned that he is not going to be able to return to any sort of occupation. I do not know whether it is appropriate to go ahead and try to file a claim reopening form before asking for repeat MRI or whether I should ask for approval for an MRI so that we may have objective evidence for a claim reopening form.

(R. 275). Dr. Chua concluded that he found Plaintiff was now "nearly disabled from his back injury."

One month after that letter, Dr. Chua's report indicates Plaintiff had lumbar disc disease (R. 237). Under "current symptoms" it states: "Back still hurts some."

On a Function Report submitted by Plaintiff to SSA on January 17, 2006, Plaintiff stated he was instantly nauseated upon awakening, throwing up for several hours (R. 120). He stated he did not take care of anyone else, and that his girlfriend and family took care of his one year old child (R.

121). He could no longer stand long enough to shave or shower, and it hurt to lay in the bathtub. He had pain trying to sit on and rise from the toilet. He did not prepare his own meals. He still did light cleaning and laundry "sometimes," about once per week. He did not shop, because it was too painful. His girlfriend did all the shopping. He was now antisocial and depressed and visited only with his son and girlfriend or family and friends who came to his house. He stated he had trouble completing tasks, but had no problem paying attention or following instructions. He stated he used a cane, but it was not prescribed by a doctor. He was taking hydrocodone/APAP four times per day, and it made him sleepy, drowsy, and sick to his stomach.

On January 20, 2006, Dr. Chua indicated Plaintiff had herniated lumbar disc and chronic nausea (R. 255). He had no abdominal pain, but "just fe[lt] 'sick' all the time." Dr. Chua noted Plaintiff felt depressed and stressed and that he "Takes care of his child during the day" (R. 254). Plaintiff reported he did not sleep well.

On January 27, 2006, State agency reviewing physician Dr. Thomas Lauderman prepared a Physical Residual Functional Capacity Assessment (RFC") after evaluating the medical evidence. Dr. Lauderman reported that the Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for about 6 hours in an eight hour workday; sit about six hours in an eight hour workday and push and/or pull (including operation of hand and or foot controls) unlimited, other than as shown for lift and/or carry (R. 257). Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl (R. 258). Plaintiff should avoid concentrated exposure to extreme cold, extreme heat and avoid even moderate exposure to hazards (R. 260). Dr. Lauderman noted Plaintiff's treatment for back pain and his statements that he could only walk 50 yards; needed to then rest for 5 to 10 minutes; had problems getting in and out of the tub and standing long enough

to shave; and was unable to shop because he could not carry anything. Although he opined that Plaintiff was credible, he also expressly stated: "The claimant's statements about his functional limitations are not entirely consistent with the evidence in the file."

On February 14, 2006, Dr. Chua reported that he had been treating Plaintiff since March 31, 2005 (R. 265). He stated that Plaintiff had completed all his prescribed treatment and still required chronic pain control with narcotic pain medications, and "[a]s a result of this, I do feel that the patient is chronically disabled and is probably not fit for any sort of employment currently."

On March 23, 2006, Dr. Chua completed a form regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. Plaintiff was able to lift and carry a maximum of less than ten pounds, stand and walk a maximum of less than two hours, and sit a maximum of less than two hours (R. 266). Plaintiff must alternate sitting, standing and walking every fifteen minutes. He had to lie down at unpredictable intervals (R. 267). Dr. Chua opined that Plaintiff was limited by severe chronic low back pain and would be absent from work more than three times a month (R. 268).

Dr. Harris, the chiropractor who had examined Plaintiff on July 12, 2005, completed a physical residual functional capacity questionnaire regarding Plaintiff dated March 26, 2006 (R. 269). There is no evidence he had seen Plaintiff since the examination eight months earlier. He noted he had diagnosed lumbar sprain/strain and lumber intervertebral disc displacement, and found Plaintiff had reached his maximum medical improvement at the time. In particular he noted that Plaintiff reported pain at a level of 5 out of 10, with increased pain walking and bending. He had found Plaintiff was not a malingerer and that no psychological conditions affected his physical condition. He opined Plaintiff could sit one to two hours at a time and stand 45 minutes at a time.

He would need to change positions at will, but would not require unscheduled breaks. He would not need a cane or other assistive device. He believed Plaintiff would be absent from work, on average, about two days per month.

On April 21, 2006, Plaintiff presented to Dr. Chua for follow up of his back pain (R. 299). He also reported a depressed mood. He described feeling withdrawn, with loss of interest. He was mostly a homebody and not social for weeks at a time. Dr. Chua diagnosed him with degenerative disc disease and depression. Plaintiff was given Lexapro and Lortab (R. 300).

X-rays of the Plaintiff's chest and abdomen were taken at Davis Memorial Hospital on May 20, 2006, due to his report of vomiting for two days. There was no acute pulmonary process and the abdomen series was unremarkable (R. 301).

On June 1, 2006, State agency medical reviewer Lateef Atiya prepared a Physical Residual Functional Capacity Assessment after evaluating the medical evidence. Dr. Atiya's primary diagnosis was lumbar disc protrusion/chronic back pain (R. 193). Dr. Atiya reported Plaintiff could lift and/or carry twenty pounds occasionally; lift and/or carry ten pounds frequently; stand and/or walk about six hours in an eight hour day; sit about six hours in an eight hour workday and push and/or pull (including operation of hand and or foot controls) unlimited, other than as shown for lift and/or carry (R. 194). Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl (R. 195). Plaintiff should avoid concentrated exposure to extreme cold, vibrations and avoid even moderate exposure to hazards (R. 197).

On June 16, 2006, Plaintiff presented to Dr. Chua for follow up of his degenerative disc disease, depression and gastritis. He said his depression had improved with medications, but his back was the same. Plaintiff was given Lexapro and Lortab (R. 297).

12

On July 14, 2006, Plaintiff presented to Dr. Chua for follow-up of his back pain (R. 295). The severity was described as "moderate." Plaintiff also reported several nausea/vomiting episodes. He was diagnosed with herniated lumbar disc and was given a prescription for Lortab (R. 295).

On October 20, 2006, Plaintiff was evaluated by Dr. Chua for a "history of abdominal discomfort" (R. 289). The onset was gradual, the location was diffuse, and the duration was 2-3 hours, every few days. It was relieved by lying in the bathtub and made worse by eating fatty food. Plaintiff was advised not to smoke or use alcohol and to avoid aspirin or other NSAID (R. 289). Plaintiff's medications were Citalopram Hydrobromide (an anti-depressant) and Hydrocodone-Acetaminophen (R. 294).

On December 18, 2006, Plaintiff reported to Dr. Chua "for follow-up of gastritis" (R. 288). He told his doctor he felt "ok," with some occasional stomach pains. He had no new complaints (R. 288). Upon examination he was well appearing, well nourished, and in no distress, with normal mood and affect. His diagnosis was gastritis and lumbar disc disease.

Plaintiff failed to appear for a January 22, 2007, appointment with Dr. Chua (R. 287).

On February 19, 2007, Plaintiff presented to Dr. Chua for follow-up of his abdominal pain and back pain (R. 286). Dr. Chua indicated Plaintiff was well-appearing, well-nourished, and in no distress, with normal mood and affect. Musculoskeletal examination showed Plaintiff had "[n]ormal gait and station. No misalignment, asymmetry, crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or extremities." Plaintiff reported he felt his back was good enough to work and he was sick only one time weekly now. He was diagnosed with lumbar disc disease and acute gastritis and was prescribed citalopram hydrobromide.

During the administrative hearing held on May 17, 2007, Plaintiff testified that he lived with his girlfriend and his son, who was currently 2 ½ years old (R. 320). On a typical day he got up around 6 or 7 in the morning and took care of his son most of the time. He testified he just read him books and watched movies, "what he could do" with him. His girlfriend did most of the housework. He went to bed typically around 10 p.m. and "sometimes" had trouble sleeping because of pain in his legs. He had pain sitting or standing, and he had to be able to get up and walk around. He believed he could stand about half an hour, walk about 100 yards, and lift at least 20 pounds "probably every couple of hours or so." He was on no medications for pain (R. 323). He was on Lexapro for depression, stating he felt worthless and suicidal at times, "[j]ust really low," due to "[n]ot being able to work and being in pain." He had not treated with anyone except his regular physician for depression. He had not discussed or considered counseling, because he "just ha[dn't] explained everything to Dr. Chuia [sic]."

Plaintiff testified he had actually wanted to try to go back to work at least a couple of times in the past six months to a year. Dr. Chua did not want him to go back to work because it would cause him more back trouble, and Plaintiff did agree, stating: "If I go against his words, then I'll be in worse shape."

The ALJ then asked the Vocational Expert ("VE") if there would be any jobs available in the national economy for a hypothetical individual of Plaintiff's age and education and work history, who would be able to perform a range of light work with a sit, stand option, occasional posturals (except no climbing ladders, ropes or scaffolds), no temperature extremes or hazards, working in a low-stress environment with no production line type of pace or independent decision-making responsibilities, doing unskilled work involving only routine and repetitive instructions and tasks

and no more than occasional interaction with other persons. The VE testified that jobs would exist for such a person. If the exertional level were reduced to sedentary, the VE testified there would still be a significant number of jobs in the national economy, as well as in West Virginia.

The VE then testified that the light jobs would require standing for a total of at least 6 hours. There would be no jobs if Plaintiff were limited to "less than sedentary" work, or if he were required to miss more than three days a month from work. If he were unable to maintain his concentration, persistence and pace for a third of the workday, there would also be no jobs.

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.     The claimant meets the insured status  requirements of the Social Security Act through December 31, 2008.

2.     The claimant has not engaged in substantial gainful activity since March 1, 2005 (20 CFR 404.1520 (b), 404.1571 *et seq.*, 416.920 (b) and 416.971 *et seq.*)

3.     The claimant has the following severe combination of impairments: Degenerative disc disease of the lumbar spine with left leg radiculopathy and Schmorl's nodes; intermittent gastritis; and depression (20 CFR 404.1520 (c) and 416.920 (c)).

        The above combination of impairment causes significant limitation in the claimant's ability to perform basic work activities. <u>Since the prior decision, which the Administrative Law Judge incorporates herein and adopts in its totality, the claimant has received treatment for gastritis and depression, which, in combination with his lumbar impairment that was found to be severe in the prior decision, have been found to be severe impairments.</u>

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

<u>Consistent with the finding in the prior decision, the objective medical evidence of record does not show compromise of any nerve root or the spinal cord in the lumbar spine, appropriate evidence of nerve root compression, or pseudoclaudication resulting in an inability to ambulate effectively necessary to meet or medically equal Listing 1.04. (Exhibits B9F; B11F, p 21).</u>

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: he is able to perform a range of light work; requires a sit/stand option; can perform postural movements occasionally except cannot climb ladders, ropes or scaffolds; should not be exposed to temperature extremes or hazards; should work in a low stress environment with no production line type of pace or any independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should have no more then occasional interactions with others.

6.  The claimant is unable to perform any past relevant work (20CFR 404.1565 and 416.965).

7.  The claimant was born on December 8, 1977, and is currently 29 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

8.  The claimant has a high school equivalent education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560 (c), 404.1566, 416.960 (c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2005, through the date of this decision (20 CFR 404.1520 (g) and 416.920 (g)).

(R. 19-28)(Emphasis added regarding previous decision)

## IV.  Contentions

A.  Plaintiff contends:

1.  The Commissioner erred as a matter of law by discounting the plaintiff's credibility without providing specific reasons supported by the evidence in the

case record.

2. The Commissioner erred as a matter of law by finding that the plaintiff is capable of work that exists in substantial numbers in the national economy.

B. The Commissioner contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff's testimony was not entirely credible.

2. Substantial evidence supports the ALJ's finding that Plaintiff could perform alternative jobs.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Credibility

Plaintiff first argues that the Commissioner erred as a matter of law by discounting the plaintiff's credibility without providing specific reasons supported by the evidence in the case record. Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff's testimony was not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996). The ALJ here found Plaintiff met the first, threshold step, in that he had medically determinable impairments that could reasonably cause pain and other symptoms he described. The ALJ was therefore required to next evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects h[is] ability to work . . . ." Id. at 594. Pursuant to Craig:

> Under the regulations, this evaluation must take into account not only the claimant's statements about [his] pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. The ALJ first notes that Plaintiff was found not credible in the prior, unappealed decision. The undersigned finds ALJ did take into account the evidence listed in Craig, above. He noted that Plaintiff now complained of depression, but had no specific mental health treatment

besides an antidepressant prescribed by his regular physician. He noted Plaintiff's positive test for marijuana while in the hospital as affecting his credibility. He also noted that Plaintiff reported good results from his medications since June 16, 2006, and reported a normal mood and affect since October 20, 2006. At his last examination by Dr. Chua in February 2007, he told the treating physician that he only had gastritis problems once a week and his back was good enough to return to work. His musculoskeletal examination was completely normal on that date. Yet at the hearing only three months later, he testified he could only sit or stand for 30 minutes or walk 100 yards. The ALJ also noted that the chiropractor who examined Plaintiff for workers' compensation in July 2005, reported that Plaintiff had not fully participated with rehabilitation in finding new employment that he could do. Significantly, Plaintiff testified at the hearing that he was taking no prescribed medication for pain. He also testified at the hearing that after waking he took care of his 2 ½ year old most of the day. Although he also testified that "taking care of" the toddler consisted mostly of reading and watching television with him, the undersigned finds even this reported activity, but more importantly, the responsibilities and duties of being the primary caregiver of a toddler during the day, substantially supports the ALJ's finding that Plaintiff could perform work at the light level with significant restrictions, including a sit/stand option, only occasional postural movements with no climbing ladders, ropes or scaffolds, no exposure to temperature extremes or hazards; working in a low stress environment with no production line- type pace or any independent decision making responsibilities; and limited to unskilled work involving only routine and repetitive instructions and tasks, with no more than occasional interactions with others.

Social Security Ruling ("SSR") 96-7p provides, in pertinent part:

One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The

adjudicator must consider such factors as:

> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

Regarding Plaintiff's reports of back pain, on his application dated April 18, 2005 (18 months after his alleged onset date), he described only one impairment, lower back pain going down his leg. He was taking one hydrocodone every 8 hours, which sometimes relieved the pain but made him drowsy. He took care of his child; prepared his own meals; and did light cleaning and laundry once a week without help or encouragement. He could pay the bills, count change, handle a savings account and use a checkbook. Significantly, although he reported not doing much socially, he also stated there were no changes in his social activity since his injury. Further, he had no problem paying attention, following instructions, understanding or completing tasks, or with memory or

concentration.

One month later, in May, 2005, Plaintiff complained to Dr. Sabio of constant aching in the spine sometimes radiating to the left leg as a severe pain. In July 2005, Plaintiff rated his pain as only a 5 on a scale of 1-10. A month later, Dr. Chua noted the severity of Plaintiff's symptoms as "moderate." But one month after that, Plaintiff reported severe chronic pain. Dr. Chua wrote to Workers' Compensation, noting Plaintiff was "doing a lot worse" since a month earlier, and had a "marked decrease in functional capacity" in that amount of time. He now considered Plaintiff "nearly disabled from his back injury."

In a January 2006 function report, Plaintiff stated he did not take care of his child. His girlfriend and family did. Yet only three days later, Dr. Chua reported Plaintiff took care of his child during the day. In the report Plaintiff stated he did not prepare meals, but still did light cleaning and laundry about once a week, but could not stand long enough to shave or take a shower.

Five months later, in June 2006, the severity of Plaintiff's back pain was again reported to be "moderate." Examination showed normal gait and station with no misalignment, asymmetry, crepitation, defects, tenderness, effusions, decreased range of motion, instability, atrophy or abnormal strength. Plaintiff himself reported his back was good enough to go back to work.

When Plaintiff was admitted to the hospital for nausea and vomiting in March 2005, it was noted he had had a previous episode three months earlier. Plaintiff did not report stomach problems in his application in April 2005. In May, 2005, he reported only a history of heartburn and said he took Reglan which relieved it. Plaintiff was admitted to hospital for vomiting in June 2005, three months after the last admission for that reason. In July 2005, he reported vomiting spells "a couple of times that year." On January 17, 2006, Plaintiff stated in a report to SSA that he was "instantly

nauseated" upon awakening, throwing up for several hours. In June 2006, he reported "several" nausea/vomiting episodes "in the past year," and that he was sick only one time per week. In October 2006, Plaintiff reported abdominal discomfort for 2-3 hours every few days.

Two months later, Plaintiff said he felt ok, with only "some occasional stomach pains."

Regarding mental problems, Plaintiff reported none in his April 2005 application. Plaintiff stated he could pay the bills, count change, handle a savings account and use a checkbook. Significantly, although he reported not doing much socially, he also stated there were no changes in his social activity since his injury. Further, he had no problem paying attention, following instructions, understanding or completing tasks, or with memory or concentration. Yet in his January 2006 report, Plaintiff stated he was "now" antisocial and depressed and visited only with his son, girlfriend, friends, and family, even though he had originally stated he did not socialize, and this was not a change due to his injury or condition. He now had trouble completing tasks, but still had no trouble paying attention or following instructions. He was taking hydrocodone four times per day and it made him sleepy and nauseous. Five months later, in June 2006, Plaintiff said his depression had improved with medications. He had normal mood and affect. Four months after that, in February 2007, Plaintiff still had normal mood and affect.

At the hearing four months later, Plaintiff, as noted, once again testified he took care of his 2 ½ year old son "most of the time." He "sometimes" had trouble sleeping due to pain. He was on no medications for pain, but was on Lexapro for depression, stating he felt worthless and suicidal at times.

Plaintiff "explained" the inconsistences in his reports and testimony to the ALJ, testifying that he "just ha[dn't] explained everything to Dr. Chua." He testified he had actually wanted to try

to go back to work at least a couple of times in the past six months to a year, but Dr. Chua did not want him to go back to work because it would cause him more back trouble, and he agreed.

Despite Plaintiff's explanation for the inconsistencies in his reports, the fact remains those inconsistencies are in the record, and the ALJ could properly consider them. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D.Va.1976)). The undersigned finds the ALJ considered the evidence as required by Craig, and also finds substantial evidence supports his credibility finding.

## C. Hypothetical to the VE

Plaintiff next argues that the Commissioner erred as a matter of law by finding that he is capable of work that exists in substantial numbers in the national economy. Plaintiff argues that the ALJ proposed a series of hypothetical questions to the Vocational Expert ("VE"), which failed to adequately all include his limitations. This failure was, he argues, in large part due to the failure of the ALJ to give appropriate weight to the medical evidence and to the opinions of theclaimant's physicians.

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform.

20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097,100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. See also Lee v. Sullivan, 945 F.2d 689 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.").

Plaintiff argues that when his counsel asked whether any jobs would exist if Plaintiff missed three or more days of work each month the VE replied in the negative. The only evidence in the record supporting a need to miss three or more days of work each month is the March 23, 2006 RFC of Dr. Chua, which the ALJ accorded little to no weight. In Craig v. Chater, 76 F.3d 585, 590(4th

Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide, [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The ALJ here found, and the undersigned agrees, that Dr. Chua's March 23, 2006, RFC is not supported by the clinical evidence, and is inconsistent with other substantial evidence. Shortly after Plaintiff's work injury, neurologist Weinstein opined Plaintiff's MRI was only minimally abnormal. X-rays showed only mild diffuse central disc bulge without significant stenosis. Shortly thereafter, Dr. Weinstein reported Plaintiff was feeling a lot better and was no longer a candidate for surgery. He recommended Plaintiff "seriously look around for some other kind of work." There is no evidence Plaintiff did look for other work.

A 2004 FCE concluded Plaintiff could perform light duty work.

On Plaintiff's application, dated April 18, 2005, Plaintiff reported only low back pain going down his left leg. He was the primary daytime caregiver of his young child. He prepared his own meals, did light cleaning and laundry, shopped for about an hour every two weeks, and had no problems with concentration or attention.

Dr. Harris found that Plaintiff had pain on supine leg raising at 35 and 40 degrees, but on

sitting straight leg raising at 80 degrees. He also opined that Plaintiff had reached maximum medical improvement regarding his Workers' Compensation claim and that his whole person impairment was only 7%. Plaintiff could return to light duty work. Plaintiff's Workers' Compensation claim was apparently closed. At about the same time, Dr. Chua found Plaintiff's symptoms were only "moderate."

However, after the claim was closed, Dr. Chua reported to Workers' Compensation that Plaintiff, had, in the two months since, become "quite a bit worse," having a lot of difficulty standing. He now had severe chronic pain, which Dr. Chua noted was a "marked decrease in functional capacity" in that one month. He wanted to know if it was "appropriate to go ahead and try to file a claim reopening form" or if he should ask for an MRI "so that we may have objective evidence for a claim reopening form." He believed Plaintiff may now be a surgical candidate, stating, "At the very least, this pain has gotten quite a bit worse recently and I am concerned that he is not going to be able to return to any sort of occupation."

Although Plaintiff reported to the SSA in January 2006, that he did not take care of his child, only three days later, Dr. Chua reported that Plaintiff took care of his child during the day. One month later, Dr. Chua reported that Plaintiff still required chronic pain control with narcotic medication and "as a result . . . [felt] that [Plaintiff] is chronically disabled and is probably not fit for any sort of employment currently." Dr. Chua then completed the form at issue.

By December 2006, Plaintiff told Dr. Chua he felt ok with some occasional stomach pains. He had no new complaints, and had normal mood and affect. Three months later, he told Dr. Chua his back was good enough to work and he was sick only once a week now. Musculoskeletal examination showed Plaintiff had normal gait and station, with no misalignment, asymmetry,

crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone. Clearly, Dr. Chua's opinion only about a year earlier that Plaintiff could be a surgical candidate was incorrect. His RFC only 9 months earlier, opining that Plaintiff was chronically disabled, was also most likely incorrect. The undersigned notes that pain symptoms may certainly lessen and worsen over time, but according to Dr. Chua, in less than one year, Plaintiff went from being chronically disabled by back pain that caused him not to be able to stand or sit, to, within a year, feeling good enough to go back to work and having an essentially normal musculoskeletal examination. By the administrative hearing, Plaintiff was not even taking pain medications. The undersigned notes Dr. Chua's specific reference to required use of narcotics in his opinion that Plaintiff was not fit for any sort of employment. Even if Dr. Chua's opinion on March 23, 2006, were correct, it is inconsistent with his own office notes and evidence.

Further, Dr. Chua's RFC is inconsistent with other evidence of record, including the opinions of two State agency reviewing physicians. Dr. Lauderman opined that Plaintiff could work at the light exertional level. Although he found Plaintiff's reported symptoms credible, he also expressly stated: "The claimant's statement about his functional limitations are not entirely consistent with the evidence in the file." State Agency reviewing physician Atiya also opined that Plaintiff could work at the light exertional level. 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The undersigned finds substantial evidence supports the ALJ's according Dr. Chua's March 2006 RFC, including his opinion that Plaintiff would miss more than three days of work per month, little to no weight. The undersigned also finds this limitation is not substantially supported by the evidence of record. The ALJ was therefore not required to include that limitation in his hypothetical or rely on the VE's response to the hypothetical containing that limitation.

Plaintiff also argues that the ALJ erred by not relying on the VE's response to the hypothetical containing a limitation that Plaintiff "would be unable to maintain his concentration, persistence and pace for, oh, I don't know, a third of a typical workday[.]" Again, the undersigned finds substantial evidence supports the ALJ's rejection of such a limitation. In his application, Plaintiff specifically stated that he had no problem paying attention, following instructions, finishing what he started, completing tasks, or with his concentration or understanding. In January 2006, although now reporting depression and trouble completing tasks, he still stated he had no problem paying attention of following instructions. Six months later he said his depression had improved with medication. In December 2006, he had normal mood and affect and was not even diagnosed with a mental impairment. He said he felt ok.

Again, in February 2007, he was in no distress, with normal mood and affect. His musculoskeletal examination was normal and Plaintiff felt good enough to work. At the administrative hearing Plaintiff reported he took care of his 2 ½ year-old son most of the day.

Further, he was on no pain medications that might cause drowsiness or lack of concentration. There is no evidence that Plaintiff would be unable to maintain his concentration, persistence and pace for a third of a typical workday– the limitation posed by counsel. The undersigned therefore finds substantial evidence supports the ALJ's rejection of such a limitation.

Even if Plaintiff did have some limitation of concentration, persistence or pace, the undersigned notes the ALJ provided for such limitation by limiting Plaintiff to work in a low stress environment with no production line-type of pace or any independent decision making responsibilities, doing unskilled work involving only routine and repetitive instructions and tasks.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's hypothetical to the VE and his reliance on the VE's responses to his hypothetical.

The undersigned United States Magistrate Judge further finds substantial evidence supports the ALJ's ultimate conclusion that Plaintiff was not disabled, as defined in the Social Security Act, from March 1, 2005, through August 3, 2007, the date of his decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly respectfully **RECOMMEND** Defendant's Motion for Summary Judgment [Docket Entry 12] be **GRANTED**, and the Plaintiff's Motion for Summary Judgment [Docket Entry 10] be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) calendar days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon

such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91(4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _2_ day of March, 2010.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE